**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| HYSTER-YALE GROUP, INC., a Delaware Corporation, 5875 Landerbrook Drive, Suite 300 Cleveland, OH  44124 <br><br> Plaintiff, <br><br> v. <br><br> CONTINENTAL INSURANCE COMPANY, a Pennsylvania Company, 333 South Wabash Chicago, IL  60604 <br><br> Defendant. | Case No. _____ <br><br> Judge _____ <br><br> **COMPLAINT** <br><br> **Jury Demand Endorsed Hereon** |

Plaintiff Hyster-Yale Group, Inc. ("Hyster-Yale") alleges as follows:

## NATURE OF CLAIM

1.       This is a civil action for breach of contract, declaratory judgment, and bad faith. The action arises out of an insurance coverage dispute between Hyster-Yale and Defendant Continental Insurance Company ("CNA") regarding coverage for asbestos-related claims ("Asbestos Claims") against Hyster-Yale.

2.       Hyster-Yale is the successor by merger to Yale Materials Handling Corporation ("Yale"), which was the successor to certain assets and liabilities of Eaton Corporation's ("Eaton") Industrial Truck Division pursuant to a December 31, 1983 asset-purchase agreement. The liabilities contractually assumed by Yale include liabilities for the Asbestos Claims.  The assets acquired by Yale broadly include rights, claims, and interests to pending or executory contracts, including policies issued by CNA to Eaton before December 31, 1983 ("Pre-1983 Policies").

1

3.      For many years, CNA agreed to pay for Asbestos Claims (and other claims) under the Pre-1983 Policies.  However, in 2015, CNA denied coverage for the Asbestos Claims [possibly in an attempt to gain advantage in its own separate coverage litigation with Eaton.] CNA's denial of coverage was without reasonable justification under Ohio law.

4.      This action also concerns policies issued by CNA to Yale on or after December 31, 1983 ("Post-1983 Policies").  CNA also has failed to pay for the Asbestos Claims under the Post-1983 Policies.

5.      On information and belief, CNA recently entered into a settlement agreement with Eaton that impaired Hyster-Yale's contractual right to access the Pre-1983 Policies.  Under that agreement, CNA sought to shift its Hyster-Yale-related coverage obligations to Eaton under an indemnification agreement.  CNA did this notwithstanding the fact that Eaton and Hyster-Yale are often joint tortfeasors with adverse interests in the Asbestos Claims.  Thus, CNA has placed its own interests, as well as the interests of another insured, over those of Hyster-Yale.  In doing so, CNA has engaged in bad faith.

6.      Hyster-Yale has suffered damages as a result of CNA's breaches of its obligations to Hyster-Yale.  Therefore, Hyster-Yale seeks from CNA declaratory relief, compensatory damages, interest, costs, attorneys' fees, and such other relief as this Court deems just and proper.

## **THE PARTIES**

7.      Hyster-Yale is a Delaware corporation with its principal place of business in Cleveland, Ohio.

8.      Continental Insurance Company ("CNA") is a Pennsylvania Company with its principal place of business in Illinois.

2

## JURISDICTION AND VENUE

9.      This Court has original diversity jurisdiction over this matter under 28 U.S.C.

§ 1332(a) in that this is a suit between citizens of different States and the amount in controversy

exceeds $75,000.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial

part of the events or omissions giving rise to the claims in the complaint occurred in this district,

namely CNA's transaction and solicitation of business in this district.

## FACTUAL ALLEGATIONS

**I.      The History of Eaton, Yale, and the Industrial Truck Division**

11.     Beginning in approximately 1920, Yale & Towne Manufacturing ("Yale &

Towne") manufactured industrial lift trucks (e.g., forklifts).  In 1963, Eaton acquired

Yale & Towne and the two entities subsequently merged, with Yale & Towne becoming Eaton's

Industrial Truck Division.

12.     In 1983, Eaton created Yale, and on December 31, 1983, Eaton and Yale executed

an Asset Acquisition Agreement ("Asset Agreement") and a Litigation Agreement (collectively

"the Agreements") that transferred Eaton's Industrial Truck Division to Yale in exchange for a

majority of Yale's stock.  As part of this transaction, several other companies, including NACCO

Industries, Inc. (then North American Coal Corporation) ("NACCO") became minority

shareholders of Yale.

13.     The Asset Agreement reflects Eaton and Yale's mutual intent to transfer broad

categories of property to Yale.  The recitations provide:

> WHEREAS, Eaton is prepared to sell and transfer (and/or cause its Canadian
> subsidiary Eaton Yale Ltd. to sell and transfer) to Yale assets of Eaton and of its
> Canadian subsidiary which are a part of the Industrial Truck Operations plus
> certain other assets of Eaton in exchange for Yale: (a) issuing and transferring all

3

of the Stock (as hereinafter defined) of Yale to Eaton, . . . (c) assuming and acquiring all the Liabilities (as hereinafter defined) of the Industrial Truck Operations and (d) otherwise proceeding in accordance with the terms and conditions contained in this agreement.

14.     Section 1 of the Asset Agreement articulates those assets transferred to Yale:

1.1 <u>Assets Being Sold.</u>  On the Closing Date (as hereinafter defined), excluding those assets described in Subsection 1.2 hereof, and subject to the other provisions of this Agreement, Eaton shall sell and transfer to Yale, and Yale shall purchase from Eaton, Eaton's facilities, equipment, inventories, rights, leases, contracts, other assets and business as the same shall exist on the Closing Date, which both are used exclusively in the Industrial Truck Operations and are identified as being sold on Schedule 1 hereto plus certain other assets of Eaton identified on Schedule 1 hereto (all items included in the sale and purchase contemplated by this Agreement referred to herein as the "Assets").

15.     In turn, Schedule 1 describes an expansive list of assets which Yale acquired, including:

(11)  All rights, claims and interests to any pending or executory contracts with respect to the purchase of materials, supplies and services, to the sale of products or services, and to claims and rights of every kind, including without limitation causes of action (to the extent such causes of action can be conveyed) but excluding claims, rights, interests and causes of action related to: (i) bad debt losses already booked by Eaton (including all subsidiaries of Eaton) through the Closing Date and (ii) rights to receive payment for or relating to any retail branch operations sold through the Closing Date;

16.     Neither Section 1.2, which describes the assets "not being sold," nor the portions of Schedule 1 which discuss the same, articulate insurance policies, choses in action under insurance policies, or causes of action against Eaton's insurers, as assets excluded from the broad transfer language in the Asset Agreement.

17.     The reason why such broad rights, including the right to access Eaton's insurance, were transferred was because Yale agreed to assume certain liabilities arising from the Industrial Truck Division:

2.3 <u>Liabilities Being Transferred and Assumed.</u>  As additional consideration for the sale and purchase of the Assets and as an essential inducement to Eaton and

4

Yale to enter into the Transaction, as of the Closing date and subject to the other
provisions of this Agreement and/or the Related Agreements (as hereinafter
defined), Eaton shall assign and transfer to Yale (or arrange such assignment and
transfer from any entity related to Eaton) and Yale shall . . . fully assume, acquire
and adopt and thereafter fully pay, discharge fulfill and/or perform all obligations,
contracts, leases, payments, losses, damages, indebtedness, duties,
responsibilities, liabilities, costs and expenses of every kind or nature whatever of
Eaton or any entity related to Eaton at . . . any time or in any fashion related to the
Industrial Truck Operations . . . . [including a]ll product liability, personal injury
and property damage claims and litigation of any nature whatever . . . relating to
the Industrial Truck Operations . . . .

18.     The Industrial Truck Division manufactured forklifts and lift trucks, components
of which allegedly contained asbestos, and in assuming liabilities arising from the Industrial
Truck Division, Yale assumed liabilities for asbestos-related bodily injuries caused by such
products.

**II.     Corporate History of Yale and its Eventual Merger with Hyster Company**

19.     In 1985, NACCO, formerly a minority shareholder of Yale, acquired from Eaton
a controlling interest in Yale.

20.     In 1989, NACCO acquired the stock of Hyster Company ("Hyster"), which was
then an Oregon corporation.  In 1994, NACCO merged Yale into Hyster and changed the name
of the surviving entity to NACCO Materials Handling Group, Inc.

21.     In December 2015, NACCO Materials Handling Group, Inc. changed its name to
Hyster-Yale Group, Inc.  Through that series of corporate acquisitions and reorganizations,
Hyster-Yale came to own the assets and property rights, including rights to access the Pre-1983
Policies, conveyed by Eaton to Yale in the Agreements, as well as the Post-1983 Policies.

**III.     The Policies**

22.     CNA's Pre-1983 Policies have over $124 million in limits.  The Pre-1983 Policies
consist of at least eight primary policies and at least seven umbrella policies issued by CNA to

Eaton—all of which cover liabilities arising from the Industrial Truck Division, including the Asbestos Claims.  A list of the Pre-1983 Policies is as follows:

| Policy Period | Policy Number | Per Occurrence Limits | Aggregate Limits | Primary/ Umbrella |
|---|---|---|---|---|
| 9/1/69-12/31/72 | L134418 | $1 million | $1 million | Primary |
| 12/31/70-12/31/73 | LX1217466 | $5 million | $5 million | Umbrella |
| 12/31/72-12/31/75 | L6304532 | $1 million | $1 million | Primary |
| 12/31/73-12/31/76 | LX6330842 | $5 million | $5 million | Umbrella |
| 9/1/75-9/1/79 | L6588357 | $1 million | $ 1 million | Primary |
| 12/31/76-12/31/77 | LX2679203 | $10 million | $10 million | Umbrella |
| 1/1/78-1/1/81 | LX2679211 | $10 million | $10 million | Umbrella |
| 1/1/79-1/1/80 | SRL3636800 | $1 million | $1 million | Primary |
| 1/1/80-1/1/81 | SRL3632840 | $1 million | $1 million | Primary |
| 1/1/81-1/1/82 | SRL3632902 | $1.25 million | $6 million | Primary |
| 1/1/81-1/1-82 | SRU215453 | $10 million | $10 million | Umbrella |
| 1/1/82-1/1/83 | SRL3632951 | $1.25 million | $6 million | Primary |
| 1/1/82-1/1/83 | SRU3196866 | $10 million | $10 million | Umbrella |
| 1/1/83-1/1/84 | SRL3632988 | $1 million | $6 million | Primary |
| 1/1/83-1/1/84 | SRU1891253 | $20 million | $20 million | Umbrella |

23.     Each of the Pre-1983 Policies was effective when Eaton and Yale entered in the Agreements, and the Agreements served to transfer Industrial Truck Division-related rights, causes of action, and/or choses in action under those policies from Eaton to Yale.

24.     In each of the primary Pre-1983 Policies, CNA promised to pay "all sums" the insured is obligated to pay as damages because of bodily injury during the policy period, caused

6

by an occurrence.  Under the primary Pre-1983 Policies, CNA has a duty to defend "even if any of the allegations of the suit are groundless, false or fraudulent."

25.     In each of the umbrella Pre-1983 Policies, CNA promised to pay "ultimate net loss" in excess of the limits of primary policies that the insured is obligated to pay because of bodily injury during the policy period, caused by an occurrence.  Under the umbrella Pre-1983 Policies, CNA likewise has a duty to defend when, among other things, the primary policies had been exhausted by payment of claims.

26.     The Post-1983 Policies consist of three primary policies issued by CNA to Yale after the 1983 transaction (together with the Pre-1983 Policies, the "Policies").  A list of those policies is as follows:

| Policy Period | Policy Number | Per Occurrence Limits | Aggregate Limits | Primary/Umbrella |
|---|---|---|---|---|
| 12/31/83-12/31/84 | SRL3633016 | $1 million | $1 million | Primary |
| 12/31/84-12/31/85 | SRL3633052 | $1 million | $1 million | Primary |
| 12/31/85-12/31/86 | SRL3633097 | $ 1.25 million | $1.5 million | Primary |

27.     Under the 1983-84 and 1984-85 policies, CNA agreed to pay "all sums" the insured is obligated to pay because of bodily injury during the policy period, caused by an occurrence.  Under these policies, CNA likewise has a duty to defend, "even if any of the allegations of the suit are groundless, false or fraudulent."  Under the same policies, CNA afforded contractual liability coverage, agreeing to pay all sums by reason of contractual liability assumed by the insured under any written contract for bodily injury during the policy period, caused by an occurrence.  CNA likewise has a duty to defend under the contractual liability coverage.

7

28.     The 1985-86 policy also affords contractual liability coverage to Yale.  The 1985-86 policy provided claims-made coverage for certain types of liability but provides different coverages for premise medical payments insurance, "blanket coverage – broad form" contractual liability insurance, and personal injury liability insurance.  For the "blanket coverage – broad form" contractual liability insurance, the coverage is occurrence-based.  CNA agreed to pay "all sums" for contractual liability assumed by the insured for bodily injury occurring during the policy period, caused by an occurrence.  Under the contractual liability coverage, CNA has a duty to defend.

29.     Defense costs do not erode the limits of liability of the Policies.

30.     Under the terms of the Policies and as provided by law, Hyster-Yale is entitled to designate the order in which the Policies and any other applicable insurance policies that cover the claims shall respond to such claims.

31.     Hyster-Yale is entitled to have the Policies interpreted or constructed in a manner that maximizes insurance protection for covered claims, and any ambiguity in the language or application of the Policies must be resolved against CNA and in favor of coverage.

32.     Each Policy has been in full force and effect since it was sold to or for the benefit of Eaton and/or Yale, including at times material to these claims.  Either: (1) Hyster-Yale has complied with or otherwise satisfied any conditions precedent to coverage or recovery under the Policies, (2) compliance with such conditions is excused, (3) CNA has suffered no prejudice as a result of any non-compliance, such conditions precedent do not apply, or (4) CNA has waived or is estopped or otherwise precluded from relying on such conditions precedent.

## IV.     The Asbestos Claims Against Hyster-Yale and CNA's Bad Faith Conduct

33.     Hyster-Yale is named as a defendant in claims alleging bodily injury as a result of

exposure to asbestos that was purportedly contained in products manufactured by Eaton's Industrial Truck Division and/or Yale after it acquired the division. The Asbestos Claims relevant to this action potentially allege bodily injury during one or more of the Policies' period of coverage.

34.     In many of the Asbestos Claims, Eaton is named as a co-defendant in connection with Eaton's distribution of asbestos-containing products unrelated to its former Industrial Truck Division.

35.     For decades, CNA paid for claims against Hyster-Yale that arise from Eaton's Industrial Truck Division under the Pre-1983 Policies. And beginning as early as 2004, CNA agreed to cover Asbestos Claims against Hyster-Yale under its Pre-1983 Policies. Some Asbestos Claims were covered under a cost-sharing agreement.

36.     In 2013, Eaton sued CNA, among other insurers, to obtain coverage for other asbestos claims faced by Eaton that were unrelated to the Industrial Truck Division.

37.     Following the filing of the coverage litigation against CNA by Eaton, CNA decided to stop paying for the Asbestos Claims against Hyster-Yale. Therefore, in 2015, CNA claimed that its policies were exhausted. However, CNA never paid its full $124 million in limits (which are not eroded by defense costs). Instead, CNA asserted that the limits of the Pre-1983 Policies were reduced by operation of a non-cumulation clause.

38.     There is no reasonable justification for CNA's decision to stop paying for the Asbestos Claims, particularly if that decision was driven by an intent to obtain advantage in CNA's separate coverage dispute with Eaton.

39.     In 2017, CNA and Eaton settled their coverage dispute. As part of settlement, CNA sought to shift its Hyster-Yale-related coverage obligations to Eaton when the parties

agreed that Eaton would indemnify CNA for claims, including Hyster-Yale's coverage claims against CNA.

40.     In seeking to transfer its Hyster-Yale-related coverage obligations to Eaton—a party that is adverse to Hyster-Yale in many of the Asbestos Claims—CNA placed its own financial interests ahead of those of Hyster-Yale and placed the financial interests of one insured over another.  Consequently, CNA has engaged in bad faith.

41.     To date, CNA owes several millions of dollars in indemnity and defense costs to Hyster-Yale.  CNA's obligation to Hyster-Yale continues to grow.

42.     CNA has breached its contractual and good-faith obligations owed to Hyster-Yale.  CNA's breach of contract and its bad faith conduct has caused Hyster-Yale to suffer damages in an amount to be ascertained at trial.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

43.     Hyster-Yale restates and incorporates by reference the allegations above.

44.     Hyster-Yale has the right to access coverage under each of the Policies.

45.     The Asbestos Claims are covered under the Policies.

46.     All conditions precedent, if any, to recovery under the Policies have been satisfied, waived, or excused, or are otherwise inapplicable.

47.     CNA has failed to pay defense and indemnity costs owed to Hyster-Yale, thus materially breaching the Policies.

48.     As a result of CNA's material breach of the Policies, Hyster-Yale has incurred monetary damages in an amount to be proven at trial, but in no event less than the sum of: (1) the out-of-pocket defense costs Hyster-Yale has paid to date; and (2) sums paid to coverage counsel to compel CNA's compliance with the Policies.

10

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment)

49.     Hyster-Yale restates and incorporates by reference all allegations above.

50.     The Asbestos Claims are covered under the Policies.

51.     All conditions precedent, if any, to recovery under the Policies have been satisfied, waived, or excused, or are otherwise inapplicable.

52.     CNA has ongoing defense and indemnity obligations flowing from the Asbestos Claims.

53.     An actual controversy exists between CNA and Hyster-Yale regarding CNA's duties and obligations under the Policies, specifically that:

   a.     Hyster-Yale has the right to access coverage under the Pre-1983 Policies;

   b.     The Policies obligated CNA to defend Hyster-Yale for Asbestos Claims;

   c.     The Policies obligate CNA to indemnify Hyster-Yale for settlements or judgments in connection with the Asbestos Claims; and

   d.     The 1985-86 policy provides contractual liability coverage on an occurrence basis.

54.     Declaratory relief will terminate some or all of the existing controversy between the parties.  The controversy is of sufficient immediacy to justify the issuance of declaratory relief.

## THIRD CLAIM FOR RELIEF
### (Bad Faith)

55.     Hyster-Yale restates and incorporates by reference all allegations above.

56.     CNA's duty of good faith and fair dealing to Hyster-Yale is implied by law in the Policies it sold and is implied by the insurance relationship between CNA and Hyster-Yale.

11

57.     The Policies contain an implied promise that CNA will deal fairly and in good faith with Hyster-Yale and will do nothing to injure, frustrate, or interfere with Hyster-Yale's rights to receive the benefits of the Policies.

58.     The covenant of good faith and fair dealing obligates CNA to refrain from taking any action that would deprive Hyster-Yale of the benefits of the contract or to cause undue hardship or harm to Hyster-Yale.

59.     CNA has no reasonable justification for its decision to stop paying for Asbestos Claims against Hyster-Yale.

60.     CNA withdrew from the defense without due consideration for Hyster-Yale's interests, thus acting in bad faith.

61.     CNA entered into an agreement with a co-insured that shifted CNA's Hyster-Yale-related coverage obligations to that co-insured, which is a party potentially adverse to Hyster-Yale in the Asbestos Claims.  In doing so, CNA has deprived Hyster-Yale of the benefit of the Pre-1983 Policies and has caused undue hardship and harm to Hyster-Yale.

62.     As a result of CNA's misconduct, Hyster-Yale has incurred damages in an amount to be proven at trial, but in no event less than the amount Hyster-Yale has paid to coverage counsel to recover sums due under the Policies.

## PRAYER FOR RELIEF

**WHEREFORE**, having fully pleaded, Hyster-Yale respectfully requests judgment and relief as follows:

1.     For an award of money damages on Count One;

2.     For judgment on Count Two, declaring the rights and obligations of Hyster-Yale and CNA under the Policies with respect to Asbestos Claims;

12

21561719.1

3.      For an award of money damages on Count Three;

4.      For pre- and post-judgment interest;

5.      For attorneys' fees and costs; and

6.      For such other relief that the Court deems equitable and just.

## **JURY DEMAND**

Hyster-Yale hereby demands a trial by jury upon all claims, matters, and issues herein that are so triable.

Respectfully submitted,

_/s/ Thomas J. Lee_
Thomas J. Lee
Cary M. Snyder
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, OH  44114-2302
Telephone:  216-706-3875
Fax:  216-241-3707
Email: tlee@taftlaw.com
Email: csnyder@taftlaw.com

Michael E. Farnell
Gabriel J. Le Chevallier
Parsons, Farnell & Grein, LLP
1030 SW Morrison Street
Portland, Oregon 97205
Telephone:  503-222-1812
Fax:  503-274-7979
Email:  mfarnell@pfglaw.com
Email:  glechevallier@pfglaw.com

*Attorneys for Plaintiff Hyster-Yale Group, Inc.*
*(Pro hac vice motion pending)*

13